# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| **JOSEFINA L. MENDOZA** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-11-CV-0221-KC** |
| | § | |
| | § | |
| **EL PASO COUNTY and EL PASO** | § | |
| **COUNTY JUVENILE BOARD,** | § | |
| | § | |
| **Defendants**. | § | |

## ORDER

On this day, the Court considered Defendants El Paso County ("EPC") and El Paso County Juvenile Board's ("EPCJB") Motion for Summary Judgment ("Motion for Summary Judgment") and EPC's Motion to Dismiss ("Motion to Dismiss") (collectively, the "Motion"), ECF No. 20.  The Court also considered Plaintiff Josefina Mendoza's Motion to Strike Summary Judgment Evidence ("Motion to Strike"), ECF No. 24.  For the reasons set forth below, the Court **GRANTS** the Motion for Summary Judgment.  The Court **DENIES** the Motion to Strike and the Motion to Dismiss as moot.

## I.    MOTION TO STRIKE

Plaintiff moves to strike fifteen affidavits submitted as part of Defendants' summary judgment evidence.  *See* Mot. to Strike 1.  As the ruling on the Motion to Strike could determine in part the facts relevant to this case, the Court considers the Motion to Strike first.  However, in ruling on the Motion, the Court does not rely upon the evidence Plaintiff seeks to strike.

Accordingly, the Court denies the Motion to Strike as moot.

## II.    BACKGROUND

Before recounting the relevant facts, the Court notes that Defendants' list of undisputed facts is woefully deficient.  The Court's Standing Orders require all parties filing motions for summary judgment to submit a document entitled "Proposed Undisputed Facts."  Standing Order Governing Mots. for Summ. J., May 1, 2012.  The Proposed Undisputed Facts must "set forth in separately numbered paragraphs a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried."  *Id.* at 1.  Responses to summary judgment motions must include a "Response to Proposed Undisputed Facts," which admits or denies each of the movant's proposed undisputed facts.  *Id.*

Defendants' Proposed Undisputed Facts are lacking.  *See* El Paso County Proposed Undisputed Facts in Supp. of Mot. for Summ. J. ("Defs.' Facts") 1, ECF No. 20-4.  Defendants offer only four proposed facts, conceding simply that EPCJP employed Plaintiff, that Plaintiff held the position of senior detention officer, she resigned in lieu of termination, and she was replaced by a younger male.[1]  Defs.' Facts 1.  Plaintiff disputes that EPCJP was Plaintiff's sole employer and that Plaintiff resigned.  Pl.'s Factual App. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. and Def. El Paso County's Mot. to Dismiss, and Resp. to Proposed Undisputed Facts ("Pl.'s Facts") 15, ECF No. 25-1.  As a result, the parties offer only two undisputed facts: that Plaintiff was a Senior Detention Officer, and she was replaced by a younger male.  Defendants

---

[1]    Specifically, Defendants list only the following facts: "El Paso County Juvenile Probation Department was Josefina Mendoza's employer," "Plaintiff Josefina Mendoza resigned in lieu of termination," "Plaintiff Josefina Mendoza was employed as the Senior Detention Officer for the detention unit at the Juvenile Probation Department prior to her resignation in lieu of termination," and "Mike Soto is a male and younger than Plaintiff Josefina Mendoza."  Defs.' Facts 1.

provide no other facts about this case.  In the Court's view, Defendants' half-hearted submission does not constitute compliance with the Court's Standing Orders.

In order to provide a factual background, therefore, the Court must divine the facts of the case from the record alone.  Consequently, the following facts are derived from the parties' pleadings and from various exhibits throughout the record.  These facts appear to be undisputed unless otherwise indicated.

At all times relevant to this suit, Plaintiff worked as the Senior Detention Officer for the detention unit at the Juvenile Probation Department ("JPD").  Mot. ¶ 4; Pl.'s Facts 1.  As Senior Detention Officer, Plaintiff was responsible for assisting Martha Matta ("Matta"), the Director of Detention ("Director"), in formulating, executing, and enforcing policies and procedures, conducting staff meetings and training, developing and implementing programs in the detention facility, creating work schedules, and maintaining the building.  Pl.'s Resp. to Defs.' El Paso County and El Paso County Juvenile Board Mot. for Summ. J. and Defendant El Paso County's Mot. to Dismiss ("Response") Ex. G ("Senior Detention Officer Job Description") 1-2, ECF No. 25-8.  Plaintiff was also required to be "[k]nowledgeable of the Texas Family Code, Title III" and to "[p]erform other duties assigned by the Director of Detention, Assistant Chief and Chief Juvenile Probation Officer."  *Id.* at 2.  Finally, Plaintiff assisted Matta with supervising, evaluating, and disciplining the entire detention unit, including six team leaders.  Pl.'s Facts 2; Senior Detention Officer Job Description 1-2.  The team leaders, along with Plaintiff and Matta, were part of the detention unit's management team.  Pl.'s Facts 2; Resp. Ex. B ("Marquez Deposition") 144:2-12, ECF No. 25-3.

Plaintiff reported to Matta, who in turn reported to the Assistant Chief and Chief Juvenile

Probation Officer.  Senior Detention Office Job Description 2; Resp. Ex. J ("Director Job Description") 3, ECF No. 25-11.  Marc Marquez ("Marquez") served as the interim Chief Juvenile Probation Officer from February of 2009 until June of 2009.  Marquez Dep. 31:13-14.  Roger Martinez ("Martinez") assumed the position of Chief Juvenile Probation Officer in June of 2009, and Marquez became the Assistant Chief in July of 2009.  Resp. Ex. C ("Martinez Deposition") 27:22-28:2, 30:15-16, ECF No. 25-4; Marquez Dep. 31:6-10.

### A.      First Organizational Survey

In March of 2009, Marquez initiated an "organizational climate survey" in order to identify areas of improvement within the JPD.  Mot. ¶ 6; Pl.'s Facts 5.  Marquez, aided by the Human Resources Department, administered the survey to four units within the JPD: the intake unit, the probation unit, the challenge unit, and the detention unit.  Marquez Dep. 109:16-21, 116:9-11; *see* Mot ¶ 6.  The survey given to the detention unit had two sections.  *See* Resp. Ex. M ("March Survey"), ECF No. 25-14.  The first section was a questionnaire containing multiple choice questions regarding work environment, management, and overall job satisfaction.  *Id.* at 1-8.  Employees were prompted to check a box marked either "Unsatisfied," "Somewhat Unsatisfied," "Satisfied," "Very Satisfied," or "Extremely Satisfied" in response to a question.  *Id.*  To illustrate, some of the questions in this section included: "My work area is a safe working environment," "Resources are freely shared throughout JPD," "My unit is effectively managed," "I can communicate well with management," "My supervisor(s) demonstrate good leadership skills," and "I am fairly paid for my work."  *Id.* at 1-2, 4-5.  The second section of the survey provided a blank space for employees to write comments about the detention unit.  *Id.* at 8-9.

Thirty-seven out of approximately fifty-five detention unit employees responded to the

questionnaire portion of the survey, and twenty-four detention unit employees provided written comments. *See* March Survey; Marquez Dep. 194:4-7.  Many of the responses provided negative feedback regarding the "management" of the detention unit.  *See generally* March Survey. Responses to management-related questions consistently showed that between approximately 40% and 63% of employees were  "unsatisfied" with the management.[2]  *Id.* at 2-5.  However, responses to questions inquiring about employee training indicated that between 45.95% and 54.05% of employees who took the survey were "satisfied" with the amount of training they received.  *Id.* at 6.

Further, many of the comments expressed negative views of "management" or "upper management."  *Id.* at 8-9.  For example, employees wrote that "upper management has created a hostile work environment," "a change in upper management is needed to improve detention," and "[s]ick leave issue in detention is outrageous and it all goes back with [sic] Director and Senior

---

[2]  Specifically, 62.16% of those who took the survey indicated they were "[u]nsatisfied" in response to the question "I trust management"; 56.76% chose "[u]nsatisfied" in response to the question "[m]anagement has a good understanding of what goes on in my unit"; 45.95% responded "[u]nsatisfied" to the question "I can communicate effectively with management"; 48.65% responded  "[u]nsatisfied" to the question "[m]y unit is effectively managed"; 51.35% responded  "[u]nsatisfied" to the question "I am treated with respect by management"; 59.46% responded  "[u]nsatisfied" to the question "[m]anagement takes employee suggestions seriously"; 63.89% responded  "[u]nsatisfied" to the question "[m]anagement is consistent in their approach"; 45.95% responded "[u]nsatisfied" to the question "[m]y supervisor(s) demonstrate good leadership skills"; 40.54% responded  "[u]nsatisfied" to the question "[m]anagement keeps my unit adequately informed about what is going on in JPD"; 59.46% responded  "[u]nsatisfied" to the question "[a]t my unit, management seeks the involvement of employees when making important decisions"; and 54.05% responded "[u]nsatisfied" to the question "I receive positive feedback at least as often as negative feedback."  Pl.'s Resp. to Defs.' El Paso County and El Paso County Juvenile Board Mot. for Summ. J. and Defendant El Paso County's Mot. to Dismiss ("Response")  Ex. M ("March Survey") 2-5, ECF No. 25-14. However, 48.65% responded "[s]atisfied" to the question "[m]anagement assigns me an appropriate amount of work"; 37.84% responded "[s]omewhat [s]atisfied" to the question "I received adequate feedback about my performance."  *Id.* at 3, 5.

Officer who are never in detention." *Id.* Nevertheless, the survey responses also indicated that some employees were "very happy to work for this company." *Id.* at 8. Some employees even wrote"[o]verall, I love my job" and "I like working at JPD." *Id.* However, none of the positive comments specifically concerned the detention unit's management team. *See id*. at 8-9.

### B.    Process Improvement Team

In response to the survey results, Marquez put together a "Process Improvement Team" ("PIT") for the detention unit in order to improve the problem areas illuminated by the survey. *See* Resp. Ex. A ("Mendoza Deposition") Ex. 7 ("PIT Handout"), ECF No. 25-2. The PIT's purpose was to identify, craft and implement solutions to problems within the detention unit. PIT Handout 1. The PIT consisted of "a team of individuals . . . committed to creating solutions to areas needing improvement in their respective units. Anyone [could] participate regardless of [their] title and provide equal input." *Id.* Issues brought up in the PIT meetings included communication, lack of trust, management structure, low morale, disciplinary procedures, inconsistency with management, disconnect between staff and management, and job security. Resp. Ex. A, Exs. 10-12, ECF No. 25-2.

Plaintiff was a member of the PIT; however, the extent of her participation is unclear. *See* Mendoza Dep. Ex. 12, ECF No. 25-2; Mendoza Dep. 59:4-23 (explaining she did not participate in the PIT prior to June 2009 because she was under the impression that she had to wait for Matta to provide her with instructions); Mendoza Dep. 72:12-73:11 (stating Plaintiff began participating in the PIT after June 2009); Marquez Dep. 181:15-18 (stating Plaintiff "failed to generate any solution whatsoever" as a member of the PIT); Martinez Dep. 40:20-22 ("There didn't seem to be very much buy-in at the time by the Detention management in regards to what

-6-

needed to be done or what was actually being done.").  Defendants state that Plaintiff did not take

the PIT seriously and refused to implement any meaningful changes.  Mot. 13.  Plaintiff disputes

this assertion.  *See* Pl.'s Facts 6-7.

### C.     Second and Third Organizational Surveys

A second survey conducted in August of 2009 only addressed issues of management

effectiveness.  *See* Mot. Ex. D, Ex. 4 ("August Survey"), ECF No. 20-1.  The August Survey

results indicate that employee dissatisfaction with management had increased since March of

2009.[3]  *See generally id.*  Further, at least seven out of twenty-nine comments specifically state

that the employees assumed references to "management" on the survey referred only to the

Senior Director and Director.  *Id.* at 3-4.  Some comments specifically mention Plaintiff by name

or title.  *Id.*  Employees wrote "[u]pper management (senior officer, director) create a hostile

work environment," "[m]anagement (Martha & Josie) are making attempts to better the working

---

[3]      Specifically, 55.26% responded "[u]nsatisfied" to the question "I can
communicate effectively with management"; 65.79% responded  "[u]nsatisfied"
to the question "[m]y unit is effectively managed"; 68.42% of those who took the
survey indicated they were "[u]nsatisfied" in response to the question "I trust
management"; 73.68% chose "[u]nsatisfied" in response to the question
"[m]anagement has a good understanding of what goes on in my unit"; 52.63%
responded  "[u]nsatisfied" to the question "I am treated with respect by
management"; 60.53% responded  "[u]nsatisfied" to the question "[m]anagement
takes employee suggestions seriously"; 75.68% responded  "[u]nsatisfied" to the
question "[m]anagement is consistent in their approach"; 42.11% responded
"[u]nsatisfied" to the question "[m]anagement assigns me an appropriate amount
of work"; 63.16% responded "[u]nsatisfied" to the question "[m]y supervisor(s)
demonstrate good leadership skills"; 55.26% responded "[u]nsatisfied" to the
question "I believe my unit's Policies and Procedures are effective"; 62.16%
responded  "[u]nsatisfied" to the question "[m]anagement keeps my unit
adequately informed about what is going on in JPD"; 71.05% responded
"[u]nsatisfied" to the question "[a]t my unit, management seeks the involvement
of employees when making important decisions"; 52.63% responded
"[u]nsatisfied" to the question "I received adequate feedback about my
performance"; and 76.32% responded  "[u]nsatisfied" to the question "I receive
positive feedback at least as often as negative feedback."  Mot. Ex. D, Ex. 4
("August Survey"), ECF No. 20-1.

environment at detention, but do backslide occasionally," and "[a]dministrative Staff within Detention being Martha Matta, and Josie Mendoza are incapable of representing and respecting the Team Leaders, and Staff at EPCJPD."  *Id.*

However, a few written comments on the August Survey were identical, which raised concerns that employees were not providing independent answers.  *See id.*; Mot. ¶ 10; Pl.'s Facts 7.  Therefore, Marquez and the Human Resources Department issued a third survey.  Mot. Ex. D, Ex. 15 ("September Survey"), ECF No. 20-1.  Eighteen employees participated in the third survey.  *See id.*  The results indicated that 42.86% of those who responded were "unsatisfied" with the management in the detention unit, 35.71% were "somewhat satisfied," 11.11% were "satisfied," 1.19% were "very satisfied" and 9.13% were "extremely satisfied."  *Id.* at 2.

Plaintiff composed a memorandum addressing the results of the September Survey. Mendoza Dep. Ex. 17 ("September Memorandum"), ECF No. 25-2.  In the memorandum Plaintiff stated that she was "surprised that the rating was very low for all the questions asked." *Id.* at 1.  Plaintiff attributed the low ratings to "grudges for Disciplinary Action," a "five (5) day limit for absences" imposed by the former Assistant Chief, and a "lack of communication between Director, Senior Officer, Team Leaders and Detention Officers."  *Id.* at 1-2.  Plaintiff recommended several solutions, including that she and Matta "share information with Detention staff" regarding policies and projects, "have monthly meetings" with the staff, "conduct continuous Housing Unit visits," provide training to team leaders regarding personal issues, and have an "immediate meeting with Detention Staff" in order to explain current detention unit policy and solicit feedback.  *Id.* at 2-3.

D.      **The Room Check Incident**

On August 13 and 14, 2009, four detention officers under Plaintiff's supervision falsified records by untruthfully reporting that they had performed room checks.  Resp. 9; Mot. ¶ 11; Marquez Dep. 69:3-70-3.  Matta recommended that the officers be terminated, but did not recommend that Plaintiff be disciplined.  Marquez Dep. 75:6-7; 90:17-20.  As a result, Martinez and Marquez terminated the officers, but Plaintiff was not disciplined for the incident.  Marquez Dep. 75:8-9; Martinez Dep. 43:3-11; 46:9-16.  At the time, Marquez was satisfied with how Matta and Plaintiff handled the incident.  Marquez Dep. 77:10-22.

E.      **Corrective Action Incident**

On September 12, 2009, at 10:30 a.m., Plaintiff instructed a team leader in the detention unit to obtain a prescription for a juvenile.  Mendoza Dep. Ex. 19 ("Corrective Action Form"), ECF No. 25-2.  Plaintiff performed a follow-up to see if the prescription had been filled at 7:00 p.m. that same day.  *Id.*  Matta issued Plaintiff a "corrective action" for failing to follow up in a timely manner.  *Id.*  On October 1, 2009, Plaintiff filed an employee grievance claim disagreeing with the corrective action.  Resp. Ex. Q, ECF No. 25-18.

F.      **Resignation in Lieu of Termination**

In the fall of 2009, Marquez and Martinez decided to terminate Plaintiff and prepared a letter of termination to that effect.[4]   Mendoza Dep. Ex. 20 ("Termination Letter"), ECF No. 25-

---

[4]      It is not entirely clear who made the decision to terminate Plaintiff.  In his deposition testimony, Martinez claimed that he made the "final decision" to fire Plaintiff.  Martinez Dep. 39:22-40:2.  However, Martinez also testified that this decision was based on a memorandum prepared by Marquez that recommended Plaintiff's termination.  Martinez Dep. 45:21-47:20.  Indeed, the Termination Letter appears to have been written by both Martinez and Marquez.  Termination Letter 1-2.  Further, Marquez testified that he participated in the decision to terminate Plaintiff, and Plaintiff's position appears to be that Marquez is responsible for her termination.  Marquez Dep. 20:7-17; Compl. ¶ 10 ("On

2. On October 5, 2009, Marquez presented the Termination Letter to Plaintiff and told Plaintiff that the decision had been made to terminate her. Mendoza Dep. 125:16-126:9. Marquez provided Plaintiff with the opportunity to resign in lieu of termination, although it was made clear that Plaintiff would be terminated if she did not resign. Mendoza Dep. 125:16-130:20. Mendoza chose to resign in lieu of termination. Mendoza Dep. Ex. 21, ECF No. 25-2.[5]

On June 15, 2010, Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission and the Texas Commission on Human Rights. Resp. Ex. I, ECF No. 25-10. In the Charge, Plaintiff alleged that she was terminated because of her gender and age. *Id.* Plaintiff now sues under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq. ("Title VII"), and Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq., as amended ("ADEA"). Compl. ¶¶ 20-27. In her Complaint, Plaintiff identifies herself as a female who was over forty years of age at the time of her discharge. Compl. ¶¶ 3, 8.

## III.   DISCUSSION

### A.   Standard

A court must enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

October 5, 2009, Mr. Marc Marquez, the Deputy Chief of the Probation Department, constructively discharged Mrs. Mendoza when he forced her to resign."). It seems, therefore, that both Marquez and Martinez are responsible for the decision to terminate Plaintiff. Regardless, this does not impact the outcome of the case.

[5]   Because the distinction between termination and resignation in lieu of termination is "irrelevant for purposes of determining whether [Plaintiff's] employment ended for discriminatory reasons," the Court refers to Plaintiff's separation as a termination. *Harilall v. Univ. Health Sys. Dev. Corp.*, 174 F.3d 197, 1999 WL 152923, at *1 n.1 (5th Cir. Feb. 28, 1999).

Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323; *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).  To show the existence of a genuine dispute, the nonmoving party must support its position with citations to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[,]" or show "that the materials cited by the movant do not establish the absence . . . of a genuine dispute, or that [the moving party] cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).  The court resolves factual controversies in favor of the nonmoving party; however, factual controversies require more than "conclusory allegations," "unsubstantiated assertions," or  "a 'scintilla' of evidence."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

Further, when reviewing the evidence, the court must draw all reasonable inferences in

favor of the nonmoving party, and may not make credibility determinations or weigh evidence. *Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 478-79 (5th Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  In evaluating the parties' arguments, the "court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Reeves*, 530 U.S. at 151.  Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

   **B.     Motion for Summary Judgment**

   Defendants move for summary judgment on Plaintiff's discrimination claims.  *See generally* Mot.  Plaintiff argues that  summary judgment is improper because there are issues of fact regarding whether Defendants' explanation for Plaintiff's termination is a pretext for discrimination.  Resp. 6-11.

   **1.     Framework for discrimination claims**

   Plaintiff's gender and age discrimination claims arise under Title VII of the Civil Rights Act of 1964 and the ADEA, respectively.  Compl. ¶¶ 20-26.  Title VII forbids an employer from discriminating against an employee because of the "individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a).  The ADEA prohibits similar discrimination based on an individual's age.  29 U.S.C. § 623(a)(3).

   Title VII was the model for the ADEA.  *See* 42 U.S.C. § 2000e; *Trans-World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).  Accordingly, courts within the Fifth Circuit apply the same general framework to discrimination claims under both the ADEA and Title VII.  *See*

*Davis v. Farmers Ins. Exch.*, 372 F. App'x 517, 519 n.1 (5th Cir. 2010) (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 n.2 (5th Cir. 2002)).

A plaintiff can prove intentional discrimination with direct or circumstantial evidence. *Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010).  Absent direct evidence of discrimination, the court analyzes discrimination claims under the burden-shifting framework set out by the Supreme Court of the United States in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005).  Under this framework:

> [T]he plaintiff must first demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact that [] the employer's reason is a pretext . . . .[6]

*Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411-12 (5th Cir. 2007).

Here, Plaintiff has not submitted any direct evidence of discrimination, and instead offers circumstantial evidence.  Thus, the Court applies the *McDonnell Douglas* approach to each of Plaintiff's discrimination claims.  *See Thurston*, 469 U.S. at 121 (applying modified *McDonnell Douglas* approach to age discrimination claim); *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (applying modified *McDonnell Douglas* approach to Title VII claim).

### 2.    Plaintiff's ADEA claim

Plaintiff alleges that "her age was a motivating factor and consideration in Defendants' decision to terminate her employment."  Compl. ¶ 25.  However, Defendants claim Plaintiff was

---

[6]    Plaintiff may also offer evidence that "the employer's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiffs protected characteristic." *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411-12 (5th Cir. 2007).  However, the parties do not base their arguments on this "mixed-motive" theory.  Therefore, the Court does not address it.

terminated not because of age, but because of her "poor job performance."  Mot. ¶¶ 26-28.

Specifically, Defendants claim the survey results, combined with the detention unit's high

turnover rate, the room check incident, and the corrective action incident, all demonstrate

Plaintiff could not adequately perform her job.  Termination Letter 2-3; Marquez Dep. 19:17-18,

67:4-9 (stating Plaintiff was fired for the reasons outlined in the Termination Letter).  In

Defendants' view, this is ample evidence that Plaintiff performed poorly and that her termination

was justified.  Reply 2-4.   Indeed, Defendants argue that Plaintiff's termination was purely a

business decision, and is therefore insulated from review by the judicial practice of deferring to

good-faith employment decisions.  Reply 3.

      In response, Plaintiff attacks the credibility of Defendants' proffered reasons and attempts

to demonstrate that Defendants engaged in discriminatory behavior towards other employees.

Resp. 7-11.  Plaintiff claims Defendants' rationales for her termination are pretextual because the

surveys were inherently unreliable.  Resp. 9-11.  Moreover, Marquez allegedly failed to give

Plaintiff "concrete guidance on where she fell short," and "identify[] her responsibility for

improving the survey scores," failed to investigate the survey results, and failed to "giv[e] her the

training he [Marquez] gave his new team."  Resp. 9-11.  Plaintiff also claims Defendants both

terminated other employees due to their age and failed to give Plaintiff "the training [Marquez]

gave his new team.  *See* Resp. 4, 10.

      Defendants do not dispute that Plaintiff has established a prima facie case of age

discrimination.  Mot. ¶ 24.  Further, Plaintiff does not dispute that Defendants have met their

burden of production in offering a legitimate, non-discriminatory reason for Plaintiff's

termination — here, Plaintiff's allegedly poor job performance.  *See* Resp. 8.  Thus, the only

contested issue is whether there is a genuine issue of material fact regarding pretext. *Id.*

 In order to show pretext, Plaintiff must provide evidence of intentional discrimination or establish Defendant's explanation is false or "unworthy of credence." *Reeves*, 530 U.S. at 143, 147; *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011). "An employer's explanation is false or unworthy of credence if it is not the real reason for the employment action." *Laxton v. Gap Inc.*, 33 F.3d 572, 578 (5th Cir. 2003). The plaintiff bears the burden of proving pretext. *Reeves*, 530 U.S. at 143. "A plaintiff may meet this burden by producing evidence that either the defendant's proffered nondiscriminatory reasons are false or, if true, that [the plaintiff's] protected characteristic was, nevertheless, a motivating factor for the adverse employment action." *Matthews v. United Bhd. of Carpenters & Joiners of Am.*, 228 F. App'x 436, 439 (5th Cir. 2007) (citing *Reeves*, 530 U.S. at 148); *see also Sandstad*, 309 F.3d at 897 ("Evidence demonstrating the falsity of the defendant's explanation taken together with the prima facie case, is likely to support an inference of discrimination even without further evidence of [the employer's] true motive."). But, if the record "conclusively reveal[s] some other, nondiscriminatory reason" or if a plaintiff has presented a "weak issue of fact," then an employer will be entitled to summary judgment. *Reeves*, 530 U.S. at 148; *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 724 (5th Cir. 2002).

 Defendants offer five specific indicators of Plaintiff's poor performance: (1) a failure to effectively manage the detention unit, as shown by survey results; (2) a failure to improve her management skills, as shown by survey results; (3) the fact Plaintiff had been issued a corrective action; (4) the room check incident; and (5) the detention unit's high turnover rate. Termination Letter 2-3; Marquez Dep. 19:17-18, 67:4-9. Plaintiff claims that these rationales are pretextual.

Resp. 9-11. Specifically, Plaintiff claims Defendants' discriminatory motive is shown by (a) unreasonable reliance on the survey results, (b) Defendant's presentation of conflicting evidence on whether Plaintiff's corrective action was a reason for her termination, (c) Marquez's failure to investigate or confirm details regarding the room check incident or the detention unit's turnover rate, (d) the fact that younger, similarly situated employees were given preferential training, and (e) the fact that other employees were terminated due to their age.  Resp. 9-11; Pl.'s Facts 5-10. The Court considers each of Plaintiff's arguments in turn.

**a.      Reliance on the surveys**

The Termination Letter indicates that the primary reason for Plaintiff's termination was a lack of "management effectiveness" and inability to "improve management effectiveness" as reflected by the results of multiple organizational surveys and Plaintiff's performance as part of the PIT.  Termination Letter 2.  Plaintiff asserts the surveys were an unreliable and false "cover" to replace Plaintiff with a younger employee, and were improperly used to evaluate her individual performance.  *See* Resp. 9-11 ("Marquez justified Mendoza's termination on the results of surveys that were not reliable.").  Further, Plaintiff claims the fact that she was not given personal training or guidance between the first and second surveys to help improve her performance demonstrates pretext.  Resp. 10-11.  Moreover, Plaintiff claims Marquez's failure to investigate the survey results shows the surveys were pretextual.  Resp. 10-11.  Defendants, on the other hand, argue that Plaintiff's evidence is insufficient to demonstrate a discriminatory motive, and therefore the judicial practice of deferring to good-faith employment decisions applies to prevent the Court from questioning their reliance on the survey results.  Reply 3.

Courts often refrain from analyzing an employer's assessment of an employee's

performance or aptitude because of a reluctance to question employment decisions.  *See Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (holding "even an incorrect belief that an employee's performance is inadequate" can be a legitimate reason for an adverse employment action); *see also LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007) (refusing to question employer's decision to terminate employee for performance issues when employee disputed the underlying facts leading to decision).  Indeed, the Court's job when "conducting a pretext analysis is not to engage in second-guessing of an employer's business decisions."  *LeMaire*, 480 F.3d at 391; *see also Bryant,* 413 F.3d at 478.  Even "unfair or unwise" employment decisions are permissible under the ADEA, so long as they are not motivated by "unlawful animus."  *Eugene v. Rumsfeld*, 168 F. Supp. 2d 655, 678 (S.D. Tex. 2001) (citing *Nieto v. L & H Packing Co.*, 108 F.3d 621, 624 (5th Cir. 1997)).

Distinguishing between an unwise, but permissible employment decision, and pretextual employment action is a delicate task.  The Seventh Circuit provides a useful description of the line between unlawful pretext and a misguided, but legitimate employment decision:

> Pretext means a lie, specifically a phony reason for some action.  The question is not whether the employer properly evaluated the [employee], but whether the employer's reason . . . was honest.  Pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks.  Thus, even if [an employer's] reasons for [taking an employment action] were mistaken, ill considered or foolish, so long as [the employer] honestly believed those reasons, pretext has not been shown.

*Millbrook v.  IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) (internal citations and quotations omitted) (describing employment decision deference's place in a pretext analysis).

Consequently, pretext cannot be established by simply disagreeing with an employer's evaluations or offering evidence that only serves to rebut an employer's conclusions.  *See Kent v. Roman Catholic Church of Archdiocese of New Orleans*, No. 96-1505, 1997 WL 30201, at *3

-17-

(E.D. La. Jan. 23, 1997) (citing *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 815 (5th Cir. 1993);

*Little*, 924 F.2d at 97; *Guthrie v. Tifco Indus.*, 941 F.2d 374, 378 (5th Cir. 1991)).  Instead, "[a]

showing of pretext must extend *beyond* casting doubt on the reasonableness of the employer's

action; otherwise, the law would be converted to a just cause provision for the protected class of

employees, an effect that Congress clearly did not intend."  *Eugene*, 168 F. Supp. 2d at 678

(emphasis added) (quoting *Hanchey v. Energas Co.*, 925 F.2d 96, 98 (5th Cir. 1990)) (internal

quotations omitted).

    To show pretext, Plaintiff first attacks the reliability of the survey itself.  Plaintiff argues

that the surveys "were never designed as a tool to assess individual performance" because they

asked "very general questions and did not distinguish between the eight members of the detention

unit management team."  Resp. 9-10.  Plaintiff also claims the surveys were inaccurate because

not all of the detention unit employees responded to the surveys.  Resp. 11.  Plaintiff also claims

Defendants improperly relied on the surveys because "the first survey results had few comments

referring to [Plaintiff] and they were evenly split between positive and negative."  Resp. 10.  In

Plaintiff's view, this incomplete and conflicting response renders the surveys untrustworthy.

Pl.'s Facts 6 (stating the surveys are "not a complete picture of the views of the employees in the

detention unit.").

    Plaintiff does nothing more than disagree with Defendants' assessment of her

performance.  This does not demonstrate pretext.  *See LeMaire*, 480 F.3d at 391.  Further, the

fact that the survey contains general terms does not, as Plaintiff suggests, render it unreliable.

*See* Resp. 9-10; Pl.'s Facts 5.  To the contrary, the use of general language, coupled with the fact

that the March Survey was given to multiple departments, indicates that the surveys were

-18-

initiated as part of an honest effort to ascertain problem areas – *not* that they were an elaborate "cover" to justify Plaintiff's termination. *See* Resp. 9-10. Second, simply because not all fifty-five employees in the detention unit responded to the surveys does not mean it was unreasonable for Defendants to rely on the surveys, taken together. Out of fifty-five employees, thirty-seven responded to the first survey, thirty-eight responded to the second survey, and eighteen responded to the third and final survey. *See* March Survey; August Survey; September Survey; Marquez Dep. 194:4-7. Each of the three surveys, which were given over a seven month period of time, all showed that the majority of people who responded were not satisfied with the detention unit's management. *See generally* March Survey; August Survey; September Survey. Merely claiming that each survey did not have a 100% response rate does not show pretext, since "[a]t the pretext stage, the proper inquiry is whether [the employer's] perception of [the employee's] performance, whether accurate or not, was the reason for her discharge." *See Hervey v. Miss. Dept. of Educ.*, 404 F. App'x 865, 869 (5th Cir. 2010).

In further support of her claim that the survey results are "unworthy of credence," Plaintiff offers as evidence a positive employment evaluation covering the years 2007 through 2008. *See* Mendoza Dep. Ex. 4; *Reeves*, 530 U.S. at 143, 147. However, "[p]retext is not established by virtue of the fact that an employee has received some favorable comments in some categories, or has, in the past, received some good evaluations." *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992). Even if Plaintiff's positive evaluation did establish that she was a good employee, the issue is not whether Plaintiff was a good Senior Detention Officer, but rather whether Defendants reasonably believed that the results of the survey warranted Plaintiff's termination. *See O'Brien v. Lucas Assocs. Pers., Inc.*, 127 F. App'x

-19-

702, 707-08 (5th Cir. 2005) ("[Plaintiff's] additional effort to demonstrate pretext by proffering forms wherein certain employees attest to her good managerial skills is unavailing because the issue, for purposes of pretext analysis, is not whether [the plaintiff] was, in fact, a good managing partner."); *Sandstad*, 309 F.3d at 899 ("Merely disputing [the employer's] assessment of [the employee's] performance will not create an issue of fact."). As stated above, Plaintiff has not demonstrated the Defendants' reliance on the surveys was unreasonable.

Plaintiff next attempts to show pretext by attacking the circumstances surrounding the surveys. Plaintiff argues that Defendants' failure to investigate the accuracy of the survey comments is evidence of pretext. *See* Resp. 11. Although it appears that the Fifth Circuit has not specifically addressed failures to investigate in the context of pretext, courts in other circuits have stated that "an employer's investigation is not required to leave 'no stone unturned'" in order to have made a reasonably informed and considered decision. *Scott v. FirstMerit Corp.*, 167 F. App'x 480, 484 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). Indeed, courts refuse to "allow[] for a free-standing inference of discrimination from general allegations of deficient investigation into an incident, which on its face had no discriminatory underpinnings." *Walker v. City of N.Y.*, No. 05-CV-1283 (RER), 2010 WL 5186779, at *6 n.17 (E.D.N.Y. Dec. 15, 2010) (citing *Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009); *Civil Serv. Emps. Ass'n, Inc. v. N.Y. State Dep't of Parks, Recreation and Historic Preservation*, 689 F. Supp. 2d 267, 279 (N.D.N.Y. 2010)). Plaintiff has offered no evidence of such "discriminatory underpinnings." *See id.*

Further, the Court notes that Defendants did, in a sense, inquire into the accuracy of the March Survey by putting together the PIT. Pl.'s Facts 6 (admitting that "[r]ather than investigate

-20-

the negative comments, Marquez . . . put together [the PIT]").  Through the PIT, Marquez sought to "[i]dentify the problem, [c]larify the problem, and [a]nalyze the cause."  PIT Handout 1.  The PIT members were "encouraged to inform and get feedback from the rest of the staff" and provided that "[a]nyone can participate regardless of . . . title and provide equal input."  *Id.*  The subsequent August and September Surveys were then compared to the March Survey in order to evaluate whether the PIT had resulted in improvements.  *See* PIT Handout; Marquez Dep. 183:22-184:9.  The decision to put together the PIT rather than launch a formal investigation, and the subsequent decision to rely on the September Survey to evaluate the PIT's effectiveness are business decisions that do not demonstrate pretext.  *See LeMaire*, 480 F.3d at 391.  Indeed, the fact that Defendants reissued the August Survey after receiving complaints demonstrates Defendants' good faith in attempting to ensure accuracy, rather than dissemblance to hide a discriminatory motive.  *See* Mot. ¶ 10; Pl.'s Facts 7.

Plaintiff also attempts to show that Defendants' reliance on the surveys was pretextual by claiming that no attempts were made to help her improve her performance.  Resp. 10.  Plaintiff argues that she was "never given any notice on how she was to improve and what contribution she was expected to make to keep her job. . . . She was placed on a process improvement team, and when the team did not meet Marquez's ambiguous expectations, [Plaintiff] was fired."  Resp. 10.  However, despite Plaintiff's assertions, the record reveals that the PIT provided Plaintiff with a list of issues that needed to be addressed.  Marquez Dep.170:6-182:15; *see also* Mendoza Dep. Exs. 6-16, ECF No.25-2 (containing notes from PIT meetings outlining issues).  Indeed, the entire purpose of the PIT was to provide a process through which Plaintiff and Matta could identify and solve problems within the detention unit.  Marquez Dep. 173:9-18; PIT Handout 1.

Plaintiff even identified some of the ways in which she could act to improve the detention unit in the September Memorandum; however, these recommendations were made after the PIT process was finished.  *See* Mendoza Dep. Ex. 17.  Plaintiff submits no evidence that the PIT was inadequate to put her on notice of the improvements she needed to make, other than her statement that the goals of the PIT were "ambiguous."  *See* Resp. 10.  Such conclusory, subjective statements are insufficient to establish pretext.  *See, e.g.*, *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345-46 (5th Cir. 2007).

In short, Plaintiff has not shown the surveys were pretextual.  Instead, Plaintiff simply disputes the method in which Defendants decided to evaluate her performance.  *See* Marquez Dep. 171:16-172:23 (admitting that Plaintiff could have been given a "face-to-face" improvement plan, but that approach was "not the one that we followed").  This employment decision warrants deference.  *See LeMaire*, 480 F.3d at 391.

To be clear, the law does not require courts to blindly defer to *every* employment decision; indeed, such a blanket immunity for employment decisions would defeat the ADEA's purpose.  A case from the Court of Appeals for the Eighth Circuit provides a useful illustration of when courts should decline to defer to a defendant's employment decisions, and instead infer a discriminatory motive.  In *Ryther v. KARE 11*, a sports anchor brought an age discrimination claim against his employer, the KARE 11 television station.[7]  108 F.3d 832 (8th Cir. 1997).  KARE 11 claimed that the station made the decision to terminate the plaintiff after a "Gallup

---

[7]     The Court notes that *Ryther v. KARE 11* was decided before the Supreme Court of the United States' decision in *Reeves*. *See*  108 F.3d 832 (8th Cir. 1997). However, *Reeves* did not overturn any of the reasoning in *Ryther*.  *See  Reeves*, 530 U.S. at 143.  *Ryther* is therefore still instructive.

Survey" indicated that the plaintiff "failed in the market research." *Id.* However, the plaintiff alleged that the Gallup Survey was biased and unreliable, and was therefore pretext for discrimination. *Id.* at 840-41. Similar to the surveys at issue here, the Gallup Survey had two sections: one section utilized a "Q score technique" that involved "multiple questions to measure audience approval," while the other section consisted of "open-ended questions" allowing viewers to describe their impressions of different on-air personalities. *Id.* at 840. KARE 11 included the plaintiff in the first section of the survey; however, KARE 11 did not include questions about the plaintiff in the second section of the survey. *Id.* Other, younger sports anchors were included in both sections of the survey. *Id.*

The defendant attempted to justify this omission by claiming that the "inclusion [of questions about the plaintiff] would have made the survey 'too long' and that similar questions had been asked about in 1989 research conducted by Atkinson." *Id.* at 840. However, the Eighth Circuit found this explanation was pretextual because "if it was redundant and costly to ask open-ended questions about Ryther, it was redundant and costly to ask open-ended questions about [the younger anchors], all of whom were included in the 1989 Atkinson research." *Id.* at 840-41. Further, the court noted that the "long delay [of over one year] between the research results and the time of [the plaintiff's] dismissal" could suggest that the survey was a pretext for discriminatory animus. *Id.* at 841.

Here, there is no indication that the surveys at issue in any way singled out Plaintiff, as was the case in *Ryther*. As Plaintiff admits, the surveys contained "very general questions and did not distinguish between the eight members of the detention unit management team." Resp. 9-10. Additionally, Plaintiff was terminated less than a month after the September Survey — a

far cry from the over one year period between the Gallup Survey and the termination in *Ryther*. *See Ryther*, 108 F.3d at 835.  The plaintiff in *Ryther* succeeded because he pointed to specific ways that the Gallup Survey had been put together which suggested an underlying discriminatory motive. *See id.* at 840-41.  The decision to exclude the plaintiff from the Gallup Survey for reasons that applied equally to other employees, and the long delay between the end of the survey process and the plaintiff's termination plainly indicates that the *Ryther* defendant might have been engaged in "deceit used to cover one's tracks."  *Millbrook*, 280 F.3d at 1175.  In contrast, Plaintiff's attacks on the survey's accuracy, on Defendant's lack of investigation, and on Defendants' method of guiding Plaintiff on how to improve shows, at most, that the surveys were "mistaken, ill-considered, or foolish."  *See id.*

In sum, Plaintiff has not shown that Defendants' reliance on the survey was so unreasonable that it must have been a pretext for discrimination.  Although the Court must draw all reasonable inferences in favor of Plaintiff, *see Reeves*, 530 U.S. at 143, a mere subjective belief of discrimination is insufficient to support an inference of discriminatory intent. *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 313 (5th Cir. 1999).  Here, Plaintiff has disagreed with Defendants' business practices and reasons for discharging her, but the Court may not "substitute [it's] judgment . . . for the employer's business judgment."  *Scott v. Univ. of Miss.*, 148 F.3d 493, 509-10 (5th Cir. 1998), *abrogated on other grounds by Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 72 (2000).  Beyond Plaintiff's disagreement with Defendants' methodologies, Plaintiff has not offered any evidence other than her subjective beliefs that would allow the Court to infer discrimination.  *See Johnson v. Acosta*, No. 10-1756, 2011 WL 4381706, at *12-13 (E.D. La. Sept. 20, 2011).  Accordingly, Plaintiff's argument fails.

**b.     Marquez's failure to investigate or confirm details regarding the room check incident or the detention unit's turnover rate**

Defendants also claim that Plaintiff was terminated because of the room check incident, and the detention unit's high turnover rate.  Termination Letter 2-3.  To show pretext, Plaintiff argues Marquez "claimed [the room check incident] indicated that Mendoza failed to train the officers but never investigated what training was actually given" to the four terminated officers.  Resp. 11.  Further, Plaintiff asserts that Marquez "claimed that there was excessive turnover in the detention unit but he never investigated to compare the resignations or terminations from other years or conduct any interviews with departing employees to determine whether Mendoza's conduct was the reason for the separations."  Resp. 11.

As stated above, the Court will not permit a "free-standing inference of discrimination from general allegations of deficient investigation into an incident, which on its face had no discriminatory underpinnings."  *Walker*, 2010 WL 5186779, at *6 n.17 (citing *Sassaman*, 566 F.3d at 315; *Civil Serv. Emps. Ass'n, Inc.*, 689 F. Supp. 2d at 279).  Plaintiff offers no evidence that Marquez was required to conduct an investigation or that he conducted investigations into other, similar incidents.  Even drawing all inferences in her favor, Plaintiff's argument once again amounts to a mere disagreement with Defendants' management style.  The Court will not "second-guess[]" Defendants' employment decision absent evidence allowing the Court to infer a discriminatory motive.  *See LeMaire*, 480 F.3d at 391.  As a result, Plaintiff fails to meet her burden to show pretext.  *See Reeves*, 520 U.S. at 143.

**c.     Conflicting evidence regarding Plaintiff's corrective action**

In the Termination Letter, Defendant cites the corrective action as a reason for Plaintiff's

termination.  Termination Letter 3.  Plaintiff does not address this reason in the Response.

Plaintiff's "Statement of Relevant Facts," however, devotes a single line of argument to rebutting

this reason.  Pl.'s Facts 10.  Plaintiff states "[w]hen Marquez was asked about whether he

justified Mendoza's termination in part on this write-up, he said 'no.'"  Pl.'s Facts 10.  The Court

construes this as an attempt to show pretext based on conflicting evidence.  *See Read v. BT Alex*

*Brown Inc.*, 72 F. App'x 112, 120 (5th Cir. 2003) ("An inconsistent reason offered to explain an

employee's termination may support a finding that the reason is mere pretext.")

      To support her argument, Plaintiff relies on a section of Marquez's transcript in which he

discusses Plaintiff's corrective action.  A review of this evidence indicates that Marquez did not

necessarily offer an inconsistent reason for Plaintiff's termination.  Marquez initially stated that

he did "not recall" whether the disciplinary action played a role in Plaintiff's termination.

Marquez Dep. 212:3-4.  He repeatedly asserted that if the disciplinary action was mentioned in

the Termination Letter, then it played a role in Plaintiff's termination; if not, then it did not play a

role.  Marquez Dep. 212:4-12.  However, after being subject to repeated and confusing

questioning, Marquez stated that he did not consider the corrective action in deciding whether to

terminate Plaintiff.  Marquez Dep. 212:16-20.

      The Court cannot discern this type of vacillation anywhere else in the record.  Instead,

this appears to be the type of "weak issue of fact," that would amount to pretext.  *See Reeves*, 530

U.S. at 148; *Crawford v. Formosa Plastics Corp., La*, 234 F.3d 899, 903-904(5th Cir. 2000)

("[a] mere scintilla of evidence of pretext does not create an issue of material fact.").  This is not

sufficient to prevent the Court from granting Defendants' summary judgment motion.

### d.    Disparate treatment

In addition to attempting to show the Defendants' proffered reasons are unworthy of credence, Plaintiff also attempts to show disparate treatment by claiming Marquez failed to give her "the training [Marquez] gave his new team to empower them to make changes."  Resp. 10. To establish pretext by showing disparate treatment, a plaintiff must demonstrate that the employer gave preferential treatment to an employee outside the protected class.  *Little*, 924 F.2d at 97 (quoting *Smith v. Wal-Mart Stores*, 981 F.2d 1177, 1180 (5th Cir. 1990)); *Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 857 (S.D. Tex. 2010) (citing *Wheeler v. BL Dev. Corp*., 415 F.3d 399, 405 (5th Cir. 2005)).  Here, both members of the "new team" — Mike Soto ["Soto"] and Louis Castillo ["Castillo"] — are over forty years old and are therefore within the protected class.  Resp. Ex. D ("Castillo Deposition") 5:14-17, ECF No. 25-5 (stating Castillo was born in 1970); Resp. Ex. E ("Soto Deposition") 5:1-3, ECF No. 25-13 (stating Soto was born in 1969); *see* 29 U.S.C. § 631(a) (stating the protected class consists of those over forty years of age); *Gillum v. ICF Emergency Mgmt. Servs., LLC*, No. 08-314-C, 2010 WL 370338, at *3-4 (Jan. 29, 2010) (comparing employees over forty years old with employees under forty years old in analyzing disparate treatment claim under the ADEA).  Accordingly, Plaintiff's disparate treatment argument fails as to the ADEA claim.

### e.    Other employees terminated due to age

Finally, Plaintiff attempts to cast doubt on Defendants' motives by claiming that a number of other JPD employees were terminated due to their age.  First, Plaintiff offers evidence that Oscar Reyes, former Deputy Chief of Probation, and Alberto Alvarez, former Chief Probation Officer, were asked to resign in March of 2009.  Pl.'s Fact 3-4; Resp. Ex. L ("Reyes

Deposition") 36:11-37:22, ECF No. 25-13.  Reyes was over forty years old at the time he

resigned.  Reyes Dep. 8:6:21-22, 36:11-13.  It is unclear how old Alvarez was when he left his

position, but Plaintiff testified that Alvarez was replaced by a younger employee.  Mendoza Dep.

140:1-5.  Plaintiff also claims that Matta was terminated due to her age.  Pl.'s Facts 4.

      Neither Alvarez, Reyes, nor Matta appear to have filed ADEA or any other discrimination

claims.  Instead, the record reveals other reasons for their departures.   Reyes himself testified

that he and Alvarez were terminated because an incoming supervisor wanted "her own leadership

team," not because of their age.  *See* Reyes Dep. 36:16-18.  Additionally, Marquez testified that

he fired Matta for the same reasons as Plaintiff — poor performance.  *See* Marquez Dep. 28:8 -

14.  Plaintiff has presented no evidence that contradicts this testimony, and thus has not carried

her burden of production as to this issue.  *See Field v. J.C. Penney Co., Inc.*, 968 F.2d 533, 537-

38 (5th Cir. 1992) (holding plaintiff did not sustain his burden of production by only offering

testimony that several older employees were discharged because it was "not probative of the

reasons underlying [the plaintiff's] dismissal" and there could "have been any number of reasons

for the discharge of the other employees aside from age discrimination").  The "simple fact that

other people who were about same age as plaintiff were terminated does not suffice to

demonstrate that plaintiff was discharged because of [her] age, especially where [there is] no

evidence that other employees were terminated because of their age."  *Mehn v. Prof. Const. Svcs.,*

*Inc.*, No. 95-3125, 1997 WL 10247, at *5 (E.D. La. Jan. 13, 1997).  Plaintiff's argument is purely

speculative, and therefore fails.

**f.**    **Summary**

      Plaintiff has failed to show that all of Defendants' legitimate, non-discriminatory reasons

for her termination are false or "unworthy of credence."  *See McDonnell Douglas*, 411 U.S. at

802.  Plaintiff has also failed to establish disparate treatment or any sort of pattern of

discrimination.  The Court therefore grants the Motion with regard to Plaintiff's ADEA claim.

*See Kretchmer*, 374 F. App'x at 496.

### 3.    Plaintiff's Title VII gender discrimination claim

Plaintiff alleges she was discriminated based on gender in violation of Title VII.[8]

Because Plaintiff only offers circumstantial evidence of discrimination, the Court applies the

modified *McDonnell Douglas* standard to her gender discrimination claim.  *McDonnell Douglas*,

411 U.S. at 802;  *Alvarado*, 492 F.3d at 611.

As with Plaintiff's ADEA claim, Defendants admit the Plaintiff has established a prima

facie case of gender discrimination.  Mot.  ¶ 38.  Further, Plaintiff again does not dispute that her

allegedly poor job performance constitutes a legitimate, non-discriminatory reason for her

termination.  *See* Resp. 8.  Thus, the only issue before the Court is whether Defendants' proffered

reason is a pretext for discrimination.

Both parties offer the same arguments and evidence in support of their positions

regarding Plaintiff's Title VII claim as they did with respect to Plaintiff's ADEA claim.  As with

her ADEA claim, Plaintiff's attempts to show pretext by demonstrating that Defendants

improperly relied on the survey, provided conflicting evidence in relation to Plaintiff's corrective

---

[8]    Defendants' argue that Plaintiff did not properly plead a gender discrimination claim in her Complaint because the text below Plaintiff's cause of action for gender discrimination refers to age discrimination. Mot. 7-8. However, the Court finds that Plaintiff has properly pleaded a gender discrimination claim. "Pleadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). Here, despite what is clearly typo in the text below the cause of action, it is obvious from the facts asserted in the Complaint that Plaintiff asserts a claim for gender discrimination. *See generally* Compl.

action, failed to investigate the room check incident or the detention unit's turnover rate, and had

a practice of terminating older employees all must fail for the same reasons as discussed above.

However, with regard to Plaintiff's disparate treatment claim, unlike in the ADEA context,

Plaintiff's comparators are outside the protected class. *See* Resp. 10. Specifically, Plaintiff

offers for comparison Soto and Castillo, the male employees who replaced Plaintiff and Matta.

Resp. 10. Plaintiff alleges that Soto and Castillo are similarly situated to her, yet were given

more training because of their gender. *See* Resp. 10 ("Marquez . . . never gave [Plaintiff] the

kind of training he gave [Castillo and Soto,] the younger males that replaced [Plaintiff]." ).

 To establish pretext by showing disparate treatment, a plaintiff must demonstrate that the

employer gave preferential treatment to an employee outside the protected class under "nearly

identical" circumstances. *Little*, 924 F.2d at 97 (quoting *Smith*, 981 F.2d 1180). To be similarly

situated, a comparator's job title, duties, and supervisor must be more or less the same. *See, e.g.*,

*Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 305 (5th Cir. 2007); *see also Ramirez v.*

*Gonzales*, 225 F. App'x 203, 207-08 (5th Cir. 2005). Ultimately, the similarly situated inquiry is

based on the totality of the circumstances surrounding the employment situation. *Collins-Pearcy*

*v. Mediterranean Shipping Co. (USA) Inc.*, 698 F. Supp. 2d 730, 761 (S.D. Tex. 2010) (citing

*Wyvill*, 212 F.3d at 305; *Little*, 924 F.2d at 97)

 As males, Soto and Castillo are both outside the protected class. Soto and Castillo also

report to Marquez and Martinez. Director Job Description 3; Senior Detention Officer Job

Description 2; Castillo Dep. 41:5-6 (suggesting chain of command has not changed since

Plaintiff was terminated); Soto Dep. 69:23-70:3 (same). However it is unclear whether Soto and

Castillo have the same job duties as Plaintiff. Although Castillo holds a different position than

Plaintiff, there is evidence that the Director and Senior Detention Officer position overlap to some extent.  *See* Marquez Dep. 49:18 -52:17; Castillo Dep. 61:7-19; *see also* Director Job Description 1-3; Senior Detention Officer Job Description 1-2.  Nevertheless, the record indicates that the Director and Senior Detention Officer job descriptions have changed since Plaintiff was terminated.  *See* Marquez Dep. 15:11-18:12.  Although there is no evidence explaining what specific job duties changed, it appears that the Senior Detention Officer is now required to implement "evidence-based practices" and utilize a new database called "CASEWORKER/5." Marquez Dep. 15:15-17:24.  Without offering more detail regarding Soto and Castillo's job descriptions, Plaintiff has failed to carry her burden of production to offer evidence that they are similarly situated.  *See Baker v. Am. Airlines, Inc.*, 430 F.3d 750, 755 (5th Cir. 2005) (stating a plaintiff bears both the burden of persuasion and production in proving pretext).

Assuming without deciding that Castillo and Soto are similarly situated, Plaintiff's argument nevertheless fails because Plaintiff has not established that she received an unequal amount of training.  The record reveals that Castillo and Soto received management training as Director and Senior Detention Director.  Soto Dep. 44:3-13; Castillo Dep. 21:17-24:20.  Specifically, JPD hired an independent consultant to provide Soto with management and leadership training.  Soto Dep. 44:3-13.  Castillo attended mandatory training sessions, as well as a training at Sam Houston State on correctional management for directors, wardens, and captains from adult and juvenile probation facilities.  Castillo Dep. 21:19-23:15.  Castillo was also selected for a training at Georgetown University, and attended a training session at the Annie Casey Foundation.  Castillo Dep.  24:1-20.

Plaintiff admits to receiving "some" training as a Senior Detention Officer.  Mendoza Dep. 28:16-18.  In 2009, she attended an external training session entitled "Character First."  Mendoza Dep. 28:19-22.  There is no evidence that "Character First" is unequal to any training that Soto and Castillo received.  Further, Plaintiff has produced no evidence indicating that she was eligible for any of the training that Castillo and Soto attended.  Indeed, it appears that the trainings at Sam Houston State and the Annie Casey Foundation were only open to Directors.  Castillo Dep. 23:13-15, 24:16-25:3.  Additionally, Plaintiff does not mention whether she received training equal to the training given to Soto or Castillo when she first obtained the position of Senior Detention Officer.  Indeed, Castillo testified that some of the training he received was "mandatory [for] all of us," indicating that Plaintiff may have received such training at some point.  Castillo Dep. 21:24-25.  Finally, Plaintiff testifies that she never requested any further training from Marquez or Martinez.  Mendoza Dep. 30:20-31:5.  Without further details regarding Plaintiff's training, the Court cannot hold that Plaintiff has carried her burden to show she was given unequal or disparate training opportunities.  *See Baker*, 430 F.3d at 755; *Butler v. La. Dep't of Health and Hosps.*, No. 07-723-SCR, 2009 WL 2382556, at *14 (M.D. La. July 13, 2009) (stating a plaintiff must "come forward with . . . specific facts to show that individuals outside her protected class and similarly situated to her were given more favorable treatment with regard to training").

Because Plaintiff has failed to show that there is an issue of fact regarding pretext, the Court grants Defendants' Motion for Summary Judgment with regard to Plaintiff's Title VII claim.

### C.   Motion to Dismiss

EPC claims that they are not a proper jural entity and therefore should be dismissed from the case.  Mot. 17-21.  Specifically, EPC claims that it lacks capacity to be sued for Title VII and ADEA violations because EPC does not have an employment relationship with the Plaintiff.  *Id.* However, because the Court grants Defendants' Motion for Summary Judgment on all of Plaintiff's claims as to all Defendants, the Court does not need to consider this argument. Accordingly, the Court denies EPC's Motion to Dismiss as moot.

## IV.   CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendants El Paso County and El Paso County Juvenile Board's Motion for Summary Judgment, ECF No. 20.  The Court **DENIES** Plaintiff Josefina Mendoza's Motion to Strike Summary Judgment Evidence, ECF No. 24 and Defendant El Paso County's Motion to Dismiss, ECF No. 20 as moot.

**SO ORDERED.**

**SIGNED** on this 30th day of May, 2012.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE